RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0086p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

WILLIAM THOMAS,

               *Plaintiff-Appellant,*

    *v.*

CITY OF COLUMBUS, OHIO; KIMBERLEY JACOBS;
WILLIAM T. KAUFMAN,

               *Defendants-Appellees.*

No. 16-3375

---

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:14-cv-00906—Gregory L. Frost, District Judge.

Argued: December 9, 2016

Decided and Filed: April 19, 2017

Before: McKEAGUE, GRIFFIN, and KETHLEDGE, Circuit Judges.

---

## COUNSEL

**ARGUED:** Nicholas A. DiCello, SPANGENBERG, SHIBLEY & LIBER, LLP, Cleveland, Ohio, for Appellant. Timothy J. Mangan, CITY ATTORNEY'S OFFICE, Columbus, Ohio, for Appellees. **ON BRIEF:** Nicholas A. DiCello, Jeremy A. Tor, SPANGENBERG, SHIBLEY & LIBER, LLP, Cleveland, Ohio, for Appellant. Timothy J. Mangan, Janet R. Hill Arbogast, CITY ATTORNEY'S OFFICE, Columbus, Ohio, for Appellees.

---

## OPINION

---

    McKEAGUE, Circuit Judge. This case primarily concerns an officer's decision to fire his weapon. Specifically, whether that decision was reasonable when an apparent suspect exited

an ongoing burglary 40 feet away from the officer and then ran towards the officer with a gun. For the following reasons, we hold that it was and that the district court properly granted summary judgment to the defendants on the remaining claims.  Thus, we affirm.

I

In 2012, Destin Thomas lived in an apartment complex near Columbus, Ohio.  His front door opened to a breezeway.  On one end, the breezeway led to a parking lot that Destin's building shared with the others in the complex.  On the other end, it led to a grassy area that separated Destin's building from other developments and a nearby road.

At around 8:45 a.m. on a July morning, two men broke through Destin's front door. Destin called 911 from inside his bedroom and spoke quietly to avoid drawing the burglars' attention.  After a few minutes, however, the men tried to force their way into Destin's room. A struggle ensued.

As Destin confronted the intruders, the 911 dispatcher sent out a burglary alert.  The Columbus Police Department considers a burglary in progress a "priority one" call—a designation reserved for "ongoing life-threatening crimes, and situations likely to result in serious physical harm to any person."  R. 32-1, Kaufman Aff. Ex. A-3, PID 133.  Normally, the Department requires that two officers respond to these calls.  "However, if the circumstances indicate a present or an imminent threat to a citizen's safety," the Department's procedures state that "the first available sworn personnel shall respond directly and immediately to the scene." *Id.* at Ex. A-4, PID 135

Five officers in the area responded to the alert.  Officer William Kaufman was the first to arrive on the scene.  On his way to the apartment complex, Officer Kaufman received updates from the dispatcher that let him know that the caller was inside a bedroom, that multiple suspects were in the apartment, and that the dispatcher heard yelling and crashing noises in the background.

When Officer Kaufman pulled into the complex's parking lot, he stopped his cruiser a few spaces down from the breezeway's entrance.  He ran from his car toward the breezeway,

approaching it from between a parked car and truck.  Officer Kaufman says that as he ran, he could hear a commotion coming from the breezeway.  The complex was in a high-crime area and Officer Kaufman says that he expected a gun might be involved.  Officer Kaufman had his weapon unholstered.

When Officer Kaufman approached the breezeway's entrance, two men exited Destin's apartment and ran toward him.  The first had a gun in his hand.  Officer Kaufman stopped at the parking lot's edge, about 40 feet from Destin's front door.  He shouted and then fired two shots at the person with the gun, who had closed the distance to what Officer Kaufman later estimated to be ten feet.

The second suspect fled.  Officer Kaufman chased him for a few steps before stopping. He then radioed out "shots fired" and requested an ambulance.  Officer Kaufman never administered aid to the suspect that he shot, later saying that he considered it unsafe to do so with an active crime scene.  He also says that the suspect appeared to be dead.

The person that Officer Kaufman shot was not a burglar.  Rather, it was Destin, who had managed to disarm a burglar before fleeing his apartment.  Unbeknownst to Officer Kaufman, and perhaps Destin, the gun that Destin had wrestled away was unloaded.  Tragically, Destin died from the two gunshot wounds.

When the next officer arrived on the scene a few minutes later, he entered the breezeway from behind the building.  He found Officer Kaufman facing toward Destin's apartment door with his gun drawn.  Between the officers lay Destin's body, clothed only in the gym shorts that he had slept in.  The officer asked Officer Kaufman if he was okay.  Officer Kaufman responded, "I think this was the homeowner."

After more officers arrived and secured the scene, a sergeant transported Officer Kaufman to a nearby police station.  There, he met with his union-retained attorney.  Officer Kaufman then returned to the scene for initial questioning but declined to comment.

Nine days later, he submitted a statement through his attorney claiming that Destin had pointed the gun at him.  Destin's father, William Thomas, finds this implausible because Destin

had called the police.  Further, Mr. Thomas notes that Destin's bedroom faced the parking lot, meaning that he might have left his room specifically to run to Officer Kaufman.  Officer Kaufman stuck by his story during his deposition, even agreeing when the opposing lawyer suggested that the only thing that would make his firing a weapon reasonable would be Destin lifting the gun towards him.

Besides Officer Kaufman, only one other living person witnessed the shooting—the burglar that followed Destin out of the apartment.  Police captured him, but he refuses to testify.  Currently, he is pursuing relief for his felony murder conviction based on Destin's death.

II

In 2014, William Thomas sued Officer Kaufman, the City of Columbus, and the City's Police Chief, Kimberly Jacobs.  He brought two claims against Officer Kaufman under 42 U.S.C. § 1983.  The first alleged that Officer Kaufman used excessive force in violation of Destin's right to be free from unreasonable seizures—a Fourth Amendment right applied against the states by the Fourteenth Amendment.  The second asserted that Officer Kaufman violated Destin's Fourteenth Amendment due process rights by showing deliberate indifference to his serious medical needs after the shooting.  Mr. Thomas also brought state tort claims against Officer Kaufman based on the shooting.  Finally, Mr. Thomas asserted that the City and Chief Jacobs failed to properly train Officer Kaufman, thus making them liable for the shooting under 42 U.S.C. § 1983.  *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

The defendants moved for summary judgment, with Officer Kaufman asserting qualified immunity as a defense.  The district court granted the motion on the federal claims and dismissed the state claims without prejudice.  As to the excessive-force claim, the court concluded that no genuine dispute existed over Officer Kaufman's testimony that Destin pointed a gun at him, and thus it found no Fourth Amendment violation.  *See* R. 44, Opinion and Order, PID 1311.  The court then found for Officer Kaufman on the deliberate indifference claim, holding that he did not disregard the risk to Destin but acted practically under uncertain circumstances.  *Id.* at 22–23, PID 1325–26.  Lastly, the district court dismissed the failure-to-train claim because it found no constitutional violation.  *Id.*

III

Mr. Thomas appeals summary judgment on each claim. We review the district court's decision de novo. *Getz v. Swoap*, 833 F.3d 646, 652 (6th Cir. 2016). A court properly grants summary judgment when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). We "may affirm a decision of the district court for any reason supported by the record, including on grounds different from those on which the district court relied." *Stein v. Regions Morgan Keegan Select High Income Fund, Inc.*, 821 F.3d 780, 786 (6th Cir. 2016).

IV

A

The parties initially briefed this case by focusing on the same issue that the district court honed in on: whether a genuine dispute existed that Destin pointed the gun at Officer Kaufman. The district court held that no dispute existed because Mr. Thomas lacked sufficient evidence to undermine Officer Kaufman's sworn testimony. On appeal, Mr. Thomas mostly attacked the errors he perceived in that holding. We ordered supplemental briefing on the question of whether Officer Kaufman would be entitled to qualified immunity even if a jury could disbelieve Officer Kaufman and find that Destin never aimed the gun at him. We now hold that Officer Kaufman was entitled to immunity regardless of whether Destin raised the gun.

The Fourth Amendment guarantees the right to be free from unreasonable seizures. This includes the right to be free from excessive force. *Graham v. O'Connor*, 490 U.S. 386, 388 (1989). The Fourth Amendment's "objective reasonableness" standard governs whether an officer's force was excessive. *See id.* Deadly force is objectively reasonable when an officer "has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Tennessee v. Garner*, 471 U.S. 1, 3 (1985).

We analyze an officer's decision to use force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham,* 490 U.S. at 396. We do so mindful that police officers face "tense, uncertain, and rapidly evolving" situations that

require "split-second judgments." *Id.* at 397. The Fourth Amendment only requires officers to act reasonably on the information they have; it does not require them to perceive a situation accurately. *Cf. id.* at 396 ("The Fourth Amendment is not violated by an arrest based on probable cause, even though the wrong person is arrested[.]") (citation omitted).

In this circuit, we consider the officer's reasonableness under the circumstances he faced at the time he decided to use force. *See Livermore v. Lubelan,* 476 F.3d 397, 406 (6th Cir. 2007) (describing the so-called "segmented analysis" this circuit uses to analyze use-of-force claims). We do not scrutinize whether it was reasonable for the officer "to create the circumstances." *Id.* (quotation marks and citations omitted). Even if an officer approaches a scene recklessly, this will not necessarily render a later decision to protect himself unreasonable. *See Chappell v. City of Cleveland,* 585 F.3d 901, 915–16 (6th Cir. 2009).

Thus, we cannot, as Mr. Thomas urges, find a constitutional violation based on how Officer Kaufman approached the crime scene. Arguably, Officer Kaufman's decisions to rush toward the apartment without backup violated Columbus Police Department procedures. Arguably, his violations increased the likelihood that Officer Kaufman might have to use force. But those decisions were not seizures. Their reasonableness is not at issue.

Instead, we must consider the circumstances that Officer Kaufman faced in the moment he decided to use force. Officer Kaufman had responded to a dangerous call in a high-crime area. He was alone. He ran towards the breezeway between two vehicles and then stopped at the parking lot's edge. Meanwhile, two people exited an apartment and then ran towards him, the first with a gun. About 40 feet initially separated Officer Kaufman from that person, and the distance only shrank as the person closed in on him. At this range, a suspect could raise and fire a gun with little or no time for an officer to react. Given these facts, a reasonable officer would perceive a significant threat to his life in that moment. Thus, Officer Kaufman's decision to fire his gun—even if Destin never raised his—was objectively reasonable.

Mr. Thomas's arguments to the contrary underplay the danger that Officer Kaufman faced. And they rely on the hindsight bias that we guard against. Consider three propositions that Mr. Thomas advances. First, that Officer Kaufman should have warned Destin and then

waited to see if he complied.   Second, that Officer Kaufman should have reflected on the situation and then pieced together that Destin was the victim because he was shirtless. Third, that Officer Kaufman should have waited to see if the person running towards him with a gun would point it at him.  If Officer Kaufman had followed Mr. Thomas's advice, tragedy may have been avoided here.  But if Destin had been an actual criminal with a loaded gun, an officer who followed this advice could well be dead.

That Mr. Thomas's attorney elicited a different legal conclusion from Officer Kaufman does not change this analysis.   The Fourth Amendment inquiry here relies on an objective reasonableness standard—not on an officer's opinion.  *Cf. Graham*, 490 U.S. at 397 ("[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.").   And objective reasonableness is a legal conclusion reserved for this court.  *Chappell*, 585 F.3d at 909 ("[O]nce the relevant set of facts is determined and all reasonable inferences are drawn in favor of the plaintiff, to the extent supported by the record, the question whether the detectives' actions were objectively unreasonable is a pure question of law.") (citations and quotation marks omitted).

Similarly, Mr. Thomas cannot avoid summary judgment by citing his use-of-force expert's legal conclusions. *See DeMerrell v. City of Cheboygan*, 206 F. App'x 418, 426 (6th Cir. 2006) (holding that the district court did not err in ignoring expert's legal conclusions on objective reasonableness).   Mostly, that expert worked from the same faulty legal premise as Mr. Thomas—he focused on Officer Kaufman's reasonableness in approaching the scene. When pressed about whether an officer has probable cause to believe someone running at him with a gun poses a significant risk of death, the expert adopted Mr. Thomas's categorical rule that force can only be reasonable if a suspect raises his gun.  That conclusion, however, is ours to make.   And we reiterate that the circumstances here would give an officer reason to fear someone running towards him with a gun and leave him with little to no time to react if the suspect raised it.

To be clear, we do not hold that an officer may shoot a suspect merely because he has a gun in his hand.  Whether a suspect has a weapon constitutes just one consideration in assessing

the totality of the circumstances. *See Perez v. Suszczynski*, 809 F.3d 1213, 1220 (11th Cir. 2016) ("Where the weapon was, what type of weapon it was, and what was happening with the weapon are all inquiries crucial to the reasonableness determination."). Sometimes, the time or space available to an officer may mean that the reasonable thing to do is to monitor the suspect, issue a warning, or take cover. *See, e.g.*, *Dickerson v. McClellan*, 101 F.3d 1151, 1163 (6th Cir. 1996); *Brandenburg v. Cureton*, 882 F.2d 211, 213 (6th Cir. 1989). But Officer Kaufman acted objectively reasonably when he used deadly force here—even if facts beyond his knowledge meant that he actually faced no threat.

B

As to Mr. Thomas's Fourteenth Amendment claim for deliberate indifference to serious medical needs, we adopt the district court's reasoning. The Fourteenth Amendment prohibits police officers from acting with reckless disregard to those they injure. *See, e.g.*, *Scozzari v. Miedzianowski*, 454 F. App'x 455, 466 (6th Cir. 2012); *Estate of Owensby v. City of Cincinnati*, 414 F.3d 596, 604 (6th Cir. 2005). They cannot unreasonably delay medical treatment. *Scozzari*, 454 F. App'x at 464. They also cannot prioritize activities "unrelated to securing the scene" or "unnecessary to their duties" over trying to save the suspect's life. *Id.* at 465–66.

As the district court recognized, however, an officer does not act with reckless disregard when he immediately summons help and then focuses on his own safety. Here, Officer Kaufman was alone at a crime scene where multiple suspects exited a burglary—including one with a gun. He called for a medic and then took cover and waited for backup to arrive. He did not violate the Constitution by failing to render aid when doing so appeared both dangerous and futile.

C

Because no constitutional violations occurred, the district court properly granted summary judgment on Mr. Thomas's failure-to-train claim against the city and Chief Jacobs. For a municipality to be liable under 42 U.S.C. § 1983, a plaintiff must show harm "caused by a constitutional violation." *Lee v. Metro. Gov't of Nashville & Davidson Cnty.*, 432 F. App'x 435, 449 (6th Cir. 2011). No constitutional violation means no municipal liability. *See id.*

V

Officer Kaufman faced a tense, uncertain situation. Someone ran towards him with a gun after exiting a burglary about 40 feet away. Officer Kaufman fired when the person with the gun closed the distance to around 10 feet. A reasonable officer would find a significant threat to his safety under these circumstances. Under the Fourth Amendment's objective reasonableness standard, he could respond with deadly force. Thus, we affirm.