NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0281n.06

Case No. 24-3444

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Jun 06, 2025
KELLY L. STEPHENS, Clerk

|  |  |
|---|---|
| RITA KEITH, as Administrator of the Estate of Arthur Keith, deceased, and Individually as the Natural Parent of Arthur Keith, deceased, | ) ) ) ) |
|     Plaintiff-Appellant, | ) |
| v. | ) ) ) |
| JAMES GRIFFITHS, in his individual and Capacity as an Employee of the Cuyahoga Metropolitan Housing Authority, | ) ) ) ) |
|     Defendant-Appellee. | ) ) |

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO

O P I N I O N

Before: COLE, WHITE, and MATHIS, Circuit Judges.

COLE, Circuit Judge. On November 13, 2020, officer James Griffiths fatally shot Arthur Keith. Rita Keith—Keith's mother and the administrator of his estate—sued Griffiths, asserting a claim under 42 U.S.C. § 1983 for the violation of Keith's Fourth Amendment rights and various state-law claims.[1] Griffiths moved for summary judgment, and the district court granted his motion, finding that Griffiths was entitled to qualified and statutory immunity. Plaintiff challenges the district court's decision. We reverse and remand for further proceedings.

I.

On November 12, 2020, Cuyahoga Metropolitan Housing Authority Police Department (CMHA PD) received a phone call reporting that a black van with tinted windows allegedly

---

[1] Rita Keith is the administrator of Arthur Keith's estate. For clarity, we refer to Rita Keith as "plaintiff" and refer to Arthur Keith as "Keith."

involved with a shooting incident earlier that week was parked in a parking lot near a Cuyahoga Metropolitan Housing Authority property. Officers responded but did not find the van.

The following day, CMHA PD received a second call reporting the same van in the same parking lot. Three CMHA PD officers—Griffiths, Robert Lenz, and Paul Styles—responded. Griffiths proceeded to the passenger's side of the van, while Styles went to the driver's side.

From the officers' perspective, the following occurred. Griffiths opened the van's front passenger door, saw Keith in the backseat, announced it was the police, and instructed Keith: "Let me see your hands." (Griffiths Dep., R. 69-1, PageID 3066–69.) Keith exited the vehicle on the passenger's side, sliding the van door open and stepping out. Griffiths observed Keith holding a gun in his left hand "against his stomach, not pointing down, pointing straight across" while attempting to open the van's door with his right hand. (*Id.* at PageID 3074.) He ordered Keith to drop the gun. When Keith did not comply, Griffiths drew his gun. Keith "ma[de] three to four steps" away from Griffiths and towards the sidewalk. (*Id.* at PageID 3083–84.) Then, Keith "turned and raised his left hand up at [Griffiths] as if he was going to shoot." (*Id.* at PageID 3083.) Griffiths fired multiple shots—one of which hit Keith in his "left upper back" and exited through his "right chest." (Armstrong Dep., R. 66-1, PageID 1136, 1140.)

Keith fled on foot. Styles and Griffiths pursued for a short distance, until Keith fell to the ground. Styles was the first to reach Keith and observed a gun on the ground near Keith's right hand. When Griffiths arrived, he also saw the gun next to Keith. Lenz arrived last and administered aid to Keith. Lenz did not see the gun on the ground, but he observed Griffiths holding it.

Griffiths claimed he secured the gun because residents of the housing complex began to arrive on the scene. Once commanding officers responded, they secured the weapon in the trunk

of a police cruiser. One of those officers declared that when he arrived on the scene, he observed Griffiths holding a non-CMHA PD weapon, which Griffiths confirmed was recovered from the ground where Keith had fallen.

Two juveniles, Jahzir Melton and Demarion Starr, witnessed the incident and offer a different account of the events. According to Melton, who was taking out the trash when officers arrived on the scene, Keith "tried to get up and run [a]nd . . . before he could turn around, [Griffiths] started shooting, boom, boom." (Melton Dep., R. 63-1, PageID 661–62.) At the time Griffiths fired, Melton could view Keith only from the shoulders up. Following the shots, Melton ran into his apartment.

Starr was with some friends outside the apartment complex when the incident occurred. According to Starr, Keith "tried to run. When he got out the car, he tried to run and it looked like he almost tripped, and he got back up and ran, and that is when the five or six shots was let off." (Starr Dep., R. 64-1, PageID 840.) He elaborated, "[Keith] was trying to – when he got out the car, he was running straight and he tried to make like a turn, but he didn't even get to make the turn because the shots was let off. After the shots was let off, he fell." (*Id.* at PageID 842.) Responding to questions about whether Keith was facing Griffiths, Starr explained, "He was always – when he got out the car, he was to the side . . . and he turned to – as soon as he got out and turned to the side, he turned to us, the way that we was facing, to run away." (*Id.* at PageID 869–70.) Starr admitted he could not see Keith's hands at all points during the incident. He could, however, see Keith's hands as Keith was running and did not see a gun or anything else in Keith's hands. Starr also ran inside his apartment after the shots were fired.

In addition to eyewitness testimony, the record contained the following evidence. The gun Keith allegedly possessed was photographed only in the trunk of a police cruiser. The DNA on

the gun matched Keith. The autopsy reported that the entrance wound from the bullet was in the "postero-lateral left upper trunk." (Medical Examiner's Verdict, R. 66-3, PageID 1343.) The medical examiner clarified that the bullet entered Keith's "left upper back" and exited through his "right chest." (Armstrong Dep., R. 66-1, PageID 1136, 1140.)

Plaintiff sued, alleging a federal claim under 42 U.S.C. § 1983 for excessive force and state-law claims for survivorship, wrongful death, and loss of consortium. Griffiths moved for summary judgment, arguing that he is entitled to qualified immunity on the claim under § 1983 and statutory immunity under Ohio Revised Code § 2744 on the state-law claims. The district court granted summary judgment to Griffiths, finding that he is entitled to qualified and statutory immunity. Plaintiff timely appealed.

II.

We review de novo a district court's grant of summary judgment for movants raising a qualified immunity defense or a statutory immunity defense under Ohio law. *See Heeter v. Bowers*, 99 F.4th 900, 908, 921 (6th Cir. 2024). Qualified immunity shields government officials from liability for civil damages so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

A government "official is entitled to summary judgment unless a 'genuine dispute of material fact' precludes the defense." *Heeter*, 99 F.4th at 908; *see* Fed. R. Civ. P. 56(a). There is no genuine issue of material fact "[w]here the record taken as a whole could not lead a rational trier of fact to find for the [plaintiff]." *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). At this stage, we must view the evidence in the light most favorable to the nonmoving party—here, plaintiff—and draw all reasonable inferences in her favor. *See Hicks v.*

*Scott*, 958 F.3d 421, 430 (6th Cir. 2020). And "[w]here, as here, a police officer is the lone survivor of the encounter giving rise to the plaintiff's claims, we take 'particular care' in assessing the district court's grant of summary judgment." *Roberts v. Cruz*, Nos. 22-5687/22-5701, 2023 WL 2181145, at *2 (6th Cir. Feb. 23, 2023) (quoting *Burnette v. Gee*, 137 F. App'x 806, 809 (6th Cir. 2005)). We examine the applicability of qualified immunity and statutory immunity in turn.

### III.

The Fourth Amendment prohibits "unreasonable searches and seizures[.]" U.S. Const. amend. IV. "[A]n officer seizes a person when he uses force to apprehend [them]." *Torres v. Madrid*, 592 U.S. 306, 309 (2021). Such force must be reasonable and cannot be excessive. *Stewart v. City of Euclid*, 970 F.3d 667, 672 (6th Cir. 2020). This appeal concerns one alleged constitutional violation: Griffiths's use of excessive force against Keith.

To determine whether qualified immunity applies, we view the facts alleged and the evidence produced in the light most favorable to the plaintiff and determine (1) "'whether the allegations give rise to a constitutional violation[,]'" and (2) "'whether the right was clearly established at the time of the incident.'" *Coley v. Lucas County*, 799 F.3d 530, 537 (6th Cir. 2015) (quoting *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir 2013)). Importantly, at this stage, we do not need to conclusively decide these questions. Instead, we need to determine if Keith presented sufficient evidence to create a genuine dispute of material fact. *See Goodwin v. City of Painesville*, 781 F.3d 314, 321 (6th Cir. 2015).

### A.

We first consider if there is a genuine dispute of material fact as to whether Griffiths's use of force violated Keith's Fourth Amendment rights. *See Coley*, 799 F.3d at 537. An officer is entitled to qualified immunity on an excessive force claim if the officer's use of force was

objectively reasonable. *Graham v. Connor*, 490 U.S. 386, 397 (1989). This inquiry turns on: (1) "the severity of the crime at issue"; (2) whether the individual posed an immediate safety threat; and (3) whether the individual was "actively resisting arrest or attempting to evade arrest[.]" *Id.* at 396. These factors are not exhaustive. *LaPlante v. City of Battle Creek*, 30 F.4th 572, 579 (6th Cir. 2022). We evaluate these factors "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Goodwin*, 781 F.3d at 321 (quoting *Graham*, 490 U.S. at 396).

For the use of deadly force, the threat of immediate harm is a "minimum requirement." *Untalan v. City of Lorain*, 430 F.3d 312, 314 (6th Cir. 2005); *see also Palma v. Johns*, 27 F.4th 419, 432 (6th Cir. 2022). Deadly force is reasonable only "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others[.]" *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

An individual's possession of a gun alone does not create a threat that justifies the use of deadly force. *Jacobs v. Alam*, 915 F.3d 1028, 1040 (6th Cir. 2019); *see also Thomas v. City of Columbus*, 854 F.3d 361, 366 (6th Cir. 2017) ("[W]e do not hold that an officer may shoot a suspect merely because he has a gun in his hand."). And where a dispute of material fact exists pertaining to whether the suspect was pointing a gun at someone, we deny qualified immunity and permit the case to proceed to a jury. *Hicks*, 958 F.3d at 436 (collecting cases).

Here, plaintiff contends that the proffered evidence, viewed in the light most favorable to her, creates a genuine dispute of material fact as to two questions: whether Keith turned and pointed a gun at Griffiths and whether a gun was recovered from the ground near Keith's body. Considering the testimony of Griffiths and the juvenile eyewitnesses and viewing the evidence in the light most favorable to plaintiff, we agree that there is a genuine dispute of material fact as to

the first question: whether Keith turned and pointed a gun at Griffiths.  We therefore need not address the second alleged factual dispute, as the first precludes summary judgment.

1.

Griffiths asserts that before he fired at Keith, Keith turned and pointed a gun at him.  Griffiths recounted the events as follows.  Keith exited the van, and Griffiths observed Keith holding a gun in his left hand "against his stomach, not pointing down, pointing straight across" while trying to open the van's door with his right hand.  (Griffiths Dep., R. 69-1, PageID 3073–76.)  He ordered Keith to drop the gun.  Keith did not comply.  Keith "ma[de] three to four steps" away from Griffiths and towards the sidewalk.  (*Id.* at PageID 3083–84.)  Then, Keith "turned and raised his left hand up at [Griffiths] as if he was going to shoot."  (*Id.* at PageID 3083.)  Griffiths fired multiple shots.  Two other officers were present on the scene and heard portions of the incident, but neither witnessed the moment Griffiths fired his gun.

The two juvenile eyewitnesses—Melton and Starr—tell a different story.[2]  On the day of the incident, Melton described what he had observed to a Cleveland police officer.  According to Melton, Keith exited his vehicle and tried to run "when the police officers shot him 2 times." (Resp. to Mot. for Summ. J., Divisional Info., R. 81-17, PageID 4949.)  During a subsequent deposition, Melton further explained that Keith "like tried to get up and run [a]nd . . . before he could turn around, [Griffiths] started shooting[.]"  (Melton Dep., R. 63-1, PageID 661–62.)  When asked where Keith was when the shots were fired, Melton elaborated that Keith was "still trying to get out the van door" to run away, but that Keith "couldn't even turn" before Griffiths started shooting.  (*Id.* at PageID 708–09.)

---

[2] Plaintiff also mentions an interview of Rayshawn Stewart, but the district court excluded Stewart as a witness for purposes of summary judgment and trial.  Plaintiff did not oppose the motion to exclude Stewart's testimony, and we do not consider it in our analysis.

Defense counsel also deposed Starr. According to Starr, Keith "tried to run . . . almost tripped, and [] got back up and ran," and then Griffiths fired "five or six shots[.]" (Starr Dep., R. 64-1, PageID 840.) And after the shots were fired, Starr stated that Keith took "[p]robably about three or four [steps]." (*Id.* at PageID 843.)

The district court found that neither Melton nor Starr "could see Keith's hands immediately before, during, or after the discharge." (Op. and Order, R. 85, PageID 4986.) That said, Melton's and Starr's accounts undermine Griffiths's recitation of the events. According to Griffiths, Keith took a few steps away from Griffiths before "turn[ing] and rais[ing] his left hand up at [Griffiths] as if he was going to shoot." (Griffiths Dep., R. 69-1, PageID 3083.) But according to both Melton and Starr, Keith was running, or trying to run, from Griffiths when he was shot. Melton testified that Keith "got out the van and tried to turn and run." (Melton Dep., R. 63-1, PageID 706.) Starr also testified that Keith "didn't point anything, he just ran away, like he was trying to get away from something." (*Id.* at PageID 850.) But neither witness testified that Keith turned back towards Griffiths as if he was about to shoot after Keith started to run.

2.

Griffiths argues that the physical evidence nonetheless justified the district court's grant of summary judgment in his favor. But the physical facts rule does not alter our analysis. Under the physical facts rule, we do not assign probative value to witness testimony that "is positively contradicted by the physical facts[.]" *Lovas v. Gen. Motors Corp.*, 212 F.2d 805, 808 (6th Cir. 1954) (citations omitted). We apply this rule only if there are "*undisputed* physical facts" or a "lack of a triable issue of fact" fatal to the claim for relief. *Harris v. Gen. Motors Corp.*, 201 F.3d 800, 803 (6th Cir. 2000) (emphasis in original).

The district court, relying on an unpublished case, noted that "when the defendant police officer is the sole witness, summary judgment is appropriate where there is no direct evidence to rebut the defendant's version of the events." (Op. and Order, R. 85, PageID 4980 (citing *Burnette*, 137 F. App'x at 809).) Here, however, Griffiths was not the sole witness. Starr, Melton, and the other officers witnessed the events. Admittedly, none of the other witnesses could see Keith's hands during the entire duration of the encounter, but the juvenile witnesses could observe whether Keith turned back towards Griffiths. Therefore, the fact that the witnesses did not observe Keith's hands does not resolve this particular issue of fact.

The district court also relied on inconsistencies between Starr's testimony and the facts at the scene including the van color, the window tint, the direction of the van, and the location where Keith ultimately fell. These physical facts are not fatal to plaintiff's claim for relief because they do not directly contradict his key testimony on the disputed fact: that Keith was turned and running away from Griffiths when he was shot. As such, any contradictions in Starr's testimony are best left to the jury to resolve.

Additionally, even if the factual evidence indisputably established that Keith was holding a gun, the physical evidence still does not resolve whether Keith *turned and pointed* the gun at Griffiths. *See Hicks*, 958 F.3d at 436. The medical examiner acknowledged that the entrance wound is consistent with either Keith turning and pointing a gun *or* with flight. And the remaining physical evidence does not resolve this issue of fact. Thus, the eyewitness testimony regarding whether Keith turned and pointed a gun at Griffiths is not "'obviously inconsistent with, contradicted by, undisputed physical facts.'" *See Harris*, 201 F.3d at 803 (quoting *Lovas*, 212 F.2d at 12–13).

Ultimately, whether deadly force was justified depends on whether Keith turned and pointed a gun at Griffiths. The parties offer competing testimony, and the medical examiner's findings permit either conclusion. Although we recognize that there are some inconsistencies in Melton's and Starr's testimony, determinations of witnesses' credibility are best left to the jury. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions[.]"). "[S]imply because [plaintiff] might find it difficult to convince a jury to believe [the juvenile witnesses] does not allow us to ignore [their] testimony now." *See Gambrel v. Knox County*, 25 F.4th 391, 404 (6th Cir. 2022).

Therefore, viewing the evidence in a light most favorable to plaintiff, we conclude that there is a genuine dispute of material fact as to whether Griffiths's use of force violated Keith's Fourth Amendment rights.

B.

Because a reasonable juror could conclude that Griffiths violated Keith's Fourth Amendment rights, we next consider whether the right at issue was clearly established. An officer's use of excessive force violates the Fourth Amendment. *Binay v. Bettendorf*, 601 F.3d 640, 647 (6th Cir. 2010). We have consistently held that the general right to be free from excessive force is clearly established. *See, e.g.*, *Brown v. Lewis*, 779 F.3d 401, 419 (6th Cir. 2015) ("The right to be free of excessive force, as a general matter, is clearly established.").

Viewing the facts in the light most favorable to plaintiff and accepting the genuine dispute that remains, a reasonable juror could find that Griffiths violated Keith's constitutional rights through his potentially unreasonable use of force. It has long been established in this circuit that individuals have a right "'not to be shot unless [they are] perceived to pose a threat to the pursuing

officers or to others[.]'" *See Yates v. City of Cleveland*, 941 F.2d 444, 447 (6th Cir. 1991) (quoting *Robinson v. Bibb*, 840 F.2d 349, 351 (6th Cir. 1988)). If Keith did not turn and point a gun at Griffiths, Griffiths violated Keith's clearly established right to be free from deadly force, as a reasonable officer in Griffiths's shoes would have been on sufficient notice that "his specific conduct was unlawful." *See Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 6 (2021).

Viewing the facts in the light most favorable to plaintiff, her claim survives Griffiths's qualified immunity defense and should proceed to trial.

IV.

We next turn to plaintiff's state-law claims. The district court determined Griffiths was entitled to statutory immunity on plaintiff's claims under Ohio law because "he did not violate the Fourth Amendment's reasonableness requirement." (Op. and Order, R. 85, PageID 4991.) On appeal, plaintiff asserts that the district court's grant of statutory immunity under Ohio law was erroneous because "there is a dispute of material fact as to whether the actions of Griffiths were reasonable under the Fourth Amendment, and whether his actions 'were with malicious purpose, in bad faith, or in a wanton or reckless manner.'" (Appellant Br. 47 (quoting Ohio Rev. Code § 2744.03(A)(6)(b)).) We agree.

Ohio law does not immunize "acts or omissions [done] with malicious purpose, in bad faith, or in a wanton or reckless manner." Ohio Rev. Code § 2744.03(A)(6)(b). Here, the resolution of the state-law immunity issue depends on the same disputed material fact as the federal qualified immunity determination—whether Keith turned and pointed a gun at Griffiths. Accordingly, Griffiths's "statutory immunity defense stands or falls with [his] federal qualified immunity defense." *See Hopper v. Phil Plummer*, 887 F.3d 744, 760 (6th Cir. 2018).

We therefore conclude that Griffiths the district court erred in granting Griffiths statutory immunity on summary judgment.

V.

For these reasons, we reverse the district court's grant of qualified and statutory immunity to Griffiths and remand to the district court for further proceedings consistent with this opinion.